# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KEEPER SECURITY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:23-cv-01043 |
| ) | |
| KEEPER TAX INC., ) | Hon. LaShonda A. Hunt |
| ) | Mag. Judge Maria Valdez |
| Defendant. ) | |

**PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(b)**

## TABLE OF CONTENTS

**Page**

I. LEGAL STANDARD ................................................................................................. 1

II. ARGUMENT ............................................................................................................... 1

    A. Keeper Is Entitled To Judgment As A Matter Of Law On Trademark Infringement ................................................................. 1

    B. There Is No Basis For The Jury Verdict Of No Infringement ............................. 3

        1. The Evidence Of The Similarity Between The Marks In Appearance And Suggestion .................................................. 3

        2. Similarity Of The Products ........................................................................ 5

        3. Advertised In Similar Stores or Outlets .................................................... 7

        4. Keeper And Keeper Tax Have Common Consumers That Are Not Sophisticated ...................................... 10

        5. Customers Associate The Name Keeper with Keeper Security's Products ......................................................... 12

        6. Keeper Presented Unrebutted Testimony Of Actual Confusion ................. 13

        7. Keeper Tax Intended To Pass Off Its Product As That Of Keeper Security And Intended To Confuse Customers .................. 14

III. KEEPER IS ENTITLED TO A JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE A NEW TRIAL ............................... 15

IV. CONCLUSION ......................................................................................................... 16

## TABLE OF AUTHORITIES

Page(s)

### Federal Cases

*Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*,
  2013 U.S. Dist. LEXIS 180912 (N.D. Ill. Dec. 27, 2013) ...................................................... 4, 9

*AutoZone, Inc. v. Strick*,
  543 F.3d 923 (7th Cir. 2008) ........................................................................................ 4, 5, 7, 11, 12

*CAE, Inc. v. Clean Air Eng'g, Inc.*,
  267 F.3d 660 (7th Cir. 2001) ........................................................................................ 5, 7, 11, 14

*Campbell v. Miller*,
  499 F.3d 711 (7th Cir. 2007) ............................................................................................... 15

*Eli Lilly & Co. v. Nat. Answers, Inc.*,
  233 F.3d 456 (7th Cir. 2000) ................................................................................................. 2

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ............................................................................................... 15

*Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*,
  846 F.2d 1079 (7th Cir. 1988) ........................................................................................... 5, 13

*Martin v. Milwaukee Cty.*,
  904 F.3d 544 (7th Cir. 2018) ................................................................................................. 1

*McGraw-Edison Co. v. Walt Disney Prods.*,
  787 F.2d 1163 (7th Cir. 1986) .............................................................................................. 5, 6

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*,
  128 F. 3d. 1111 (7th Cir. 1997) .............................................................................................. 4

*Miyano Mach. USA, Inc. v. Miyanohitec Mach., Inc.*,
  576 F. Supp. 2d 868 (N.D. Ill. 2008) ...................................................................................... 11

*Passananti v. Cook Cty.*,
  689 F.3d 655 (7th Cir. 2012) ................................................................................................. 1

*Promatek Indus., LTD v. Equitrac Corp.*,
  300 F.3d 808 (7th Cir. 2002) ........................................................................................ 2, 11, 13

*Reeves v. Sanderson Plumbing Prods.*,
  530 U.S. 133, 120 S. Ct. 2097 (2000) ....................................................................................... 1

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
 978 F.2d 947 (7th Cir. 1992) ...................................................................................................7

*Sullivan v. CBS Corp.*,
 385 F.3d 772 (7th Cir. 2004) .................................................................................................12

*Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*,
 87 F.3d 654 (4th Cir. 1996) ...................................................................................................13

*Union Carbide Corp. v. Ever-Ready, Inc.*,
 531 F.2d 366 (7th Cir. 1976) .................................................................................................13

**Rules**

Fed. R. Civ. P. 50......................................................................................................................1

**Other Authorities**

2 *McCarthy* § 11.73 (2008)......................................................................................................12

Plaintiff Keeper Security, Inc. ("Keeper" or "Plaintiff") hereby moves pursuant to U.S.C. Fed. R. Civ. Proc. 50(b) for judgment as a matter of law. Based on the overwhelming unrebutted evidence presented by Plaintiff, no rational juror could have found for the Defendant Keeper Tax, Inc. ("Keeper Tax" or "Defendant") on the issue of trademark infringement. Therefore, Keeper respectfully requests that this Court vacate the jury verdict reached in this case. In the alternative, Keeper respectfully requests that this Court grant a new trial.

I.  **LEGAL STANDARD**

Under Fed. R. Civ. P. 50, a district court may "enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Passananti v. Cook Cty.,* 689 F.3d 655, 659 (7th Cir. 2012). The question is whether a reasonable jury could have returned a verdict in favor of Defendant. *Id.* "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50. "[I]n entertaining a motion for judgment as a matter of law, the court should review all the evidence in the record." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110 (2000). "The court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* "[A] verdict supported by no evidence or a mere scintilla of evidence will not stand." *Martin v. Milwaukee Cty.,* 904 F.3d 544, 550 (7th Cir. 2018).

II.  **ARGUMENT**

    A.    **Keeper Is Entitled To Judgment As A Matter Of Law On Trademark Infringement**

To prove a claim for trademark infringement under the Lanham Act, a plaintiff must demonstrate "its mark is protectable and that the junior mark is likely to cause confusion among

consumers." *Eli Lilly & Co. v. Nat. Answers, Inc.,* 233 F.3d 456, 461 (7th Cir. 2000). A seven-factor test determines whether a likelihood of confusion exists: (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's. *Promatek Indus., LTD v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir. 2002). The jury was instructed as to the factors:

> Keeper Security must prove that Keeper Tax used the Keeper mark in a manner that is likely to cause confusion, mistake, and/or deception as to the source, origin, sponsorship, and/or approval of Keeper Tax's product. Keeper Security must prove a likelihood of confusion among a significant number of people who buy or use or consider buying or using the product or similar products.
>
> In deciding this, you should consider the following:
> **one**, whether the overall impression created by Keeper Tax's Keeper trademark is similar to that created by Keeper Security's Keeper trademark in appearance, sound, and/or meaning;
> **two**, whether Keeper Tax and Keeper Security use their Keeper trademarks on the same or related products;
> **three**, whether Keeper Tax's and Keeper Security's products are likely to be sold in the same or similar stores or outlets or advertised in similar media;
> **four**, the degree or care that purchasers or potential consumers are likely to exercise in buying or considering whether to buy the product; this may depend on the level of sophistication of potential buyers of the product or the cost of the product;
> **five**, the degree to which purchasers or potential purchasers recognize the Keeper trademark as an indication of the origin of Keeper Security's product;
> **six**, whether Keeper Tax's use of the Keeper trademark has led to instances of actual confusion among purchasers or potential purchasers about the source, origin, sponsorship, and/or approval of Keeper Tax's product; however, actual confusion is not required for a finding of a likelihood of confusion;
> **seven**, whether Keeper Tax intended to pass off its product as that of Keeper Security or intended to confuse consumers.

(Ex. A, Trial Tr. ("Tr.") 961-962; Federal Civil Jury Instruction of the Seventh circuit (rev. 2008) 13.1.2.3). Keeper submitted overwhelming, and unrebutted, evidence in support of each likelihood of confusion factor. No reasonable jury could have found that likelihood was not established.

B. **There Is No Basis For The Jury Verdict Of No Infringement**

As set forth in detail below, a reasonable jury did not have a legally sufficient evidentiary basis to find for the Keeper tax on the issue of trademark infringement.

1. **The Evidence Of The Similarity Between The Marks In Appearance And Suggestion**

Keeper demonstrated that the KEEPER® mark had the same overall impression as the use of the term "keeper" by Keeper Tax. The KEEPER® mark is a word mark that "consists of the standard characters without claim to any particular font, size, or color." (PTX 1). Keeper Tax used the same mark "keeper." (PTX2). The marks have the same appearance, sound and/or meaning:



(Tr. 206-207; Dkt. 29-1, 29-2, and 29-6).

Keeper Tax's CEO Paul Koullick admitted that Keeper Tax uses "Keeper" name in association with its business using the same spelling, pronunciation, and lettering as Keeper Security's registered trademark.

> Q. And if you look in the upper, left-hand corner, that says Keeper; right?
> A. That's right.
> Q. K-e-e-p-e-r?
> A. Yes. That's our registered trademark.
> Q. Same spelling as what's in Keeper Security's registered trademark?
> A. Same spelling.
> Q. Pronounced the same?
> A. We pronounce it Keeper.
> Q. And it appears the same, same letters?
> A. The letters are the same.

(Tr. 734-735; 115-118; Dkt. 29-1, 29-2). Keeper Tax's witness Lucia Tang testified that Keeper Tax uses the name "keeper" alone, without the word "tax." (Tr. 485-486). Mr. Koullick testified that Keeper uses the word "keeper" to identify its product.

> Q. Now, you're using that word Keeper to identify your product; right?
> A. We are.

(Tr. 736). Keeper Tax's testimony is consistent with the testimony of Keeper Security's CEO Darren Guccione, who testified that Keeper Tax uses an identical mark used by Keeper Security.

> Q. And just for the record, how is the logo spelled in the upper left-hand corner there?
> A. K-E-E-P-E-R.
> Q. Is that the same as your trademark?
> A. Yes.

(Tr. 115-116; Dkt. 29-2). All of the evidence on factor one was unrefuted.

To determine if the marks are similar the Court must look at the marks as a whole. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F. 3d. 1111, 1115 (7th Cir. 1997) ("noting that 'it is inappropriate to focus on minor stylistic differences to determine if confusion is likely' when the marks are not usually encountered together."); *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.,* 2013 U.S. Dist. LEXIS 180912, at *13-14 (N.D. Ill. Dec. 27, 2013) (finding that marks similar where the "American Eagle" portion of the mark was the salient portion of the mark and that the marks both used capital lettering and similar font.); *AutoZone, Inc. v. Strick,* 543 F.3d 923, 931 (7th Cir. 2008)(finding the marks similar where they contained similar stylistic components such as spelling, font, and capitalization.) The marks at issue in this case are pronounced the same way, use the same font, and appear in lower-case letters. It is undisputed that Keeper Tax's use of the mark "keeper" is similar to Keeper's use of the mark and no reasonable juror could find otherwise.

### 2. Similarity Of The Products

Keeper established that the two marks were offered to the consuming public in a manner that would associate with a common source of sponsorship. The parties in a trademark infringement action ***need not be direct competitors, nor offer the same products in order for a likelihood of confusion to be established***. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 679 (7th Cir. 2001) (emphasis added), see also *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1089 (7th Cir. 1988) ("Direct competition is not the *sine quo non* of trademark infringements; rather the gist of the action lies in the likelihood of confusion to the public."). The dissimilarity of products is not dispositive of a likelihood of confusion. *McGraw-Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1169 (7th Cir. 1986). The proper inquiry is not whether the parties offer the same products, but whether the products offered "are the kind the public might very well attribute to a single source." *Autozone, Inc. v. Strick,* 543 F.3d 923, 931 (7th Cir. 2008).

Here, Keeper offered substantial evidence that the parties offered products which consumers attributed to a single source. The Keeper product on the website explains how to securely store tax files such as the "2020 Tax Forms.xls." (Dkt. 29-16). The products offered by Keeper Tax assist individuals with filing their taxes. (Dkt. 29-2; Tr. 618). Keeper's CTO, Craig Lurey, testified that Keeper's product is designed to assist users in safely preparing, storing, sharing, and filing their tax documents:

> Q. So how is the Keeper product used?
> A. So it's used in several ways. So customers can use it to store confidential information, you know, like a password, a passkey. They can use it to encrypt and store, you know, tax documents, any sort of financial documents. You can use it for bank accounts and, you know, you can protect your information with it. It encrypts the information, and then you can also share that information with trusted people.

(Tr. 310-311, 318).

> Q. And so can a user of the Keeper software file their taxes with the Keeper product?

> A. They can -- they can prepare their taxes. They can save all their documents and their credentials for their different applications, and then they can provide that to their accountant. And vice versa, the accountant can create folders with their clients and share the information directly.

(Tr. 320; 350). Mr. Lurey testified that Keeper customers use the Keeper product to prepare their taxes. (Tr. 351-352). Keeper users use the application to secure financial documents, such as tax documents, accounting files, documents that contain confidential information that is shared with accountants and tax preparers. (Tr. 357). Keeper Tax's CEO testified that the products offered by Keeper Tax assist the user with filing their taxes:

> Q. Today, what does Keeper Tax, the company, do?
> A. Keeper Tax is a tax-filing software. It's like TurboTax or H&R Block.

(Tr. 751). The software application stores sensitive tax information for tax filings. (Tr. 742). The Keeper Tax software application allows the user to share personal data:

> Q. Now, Mr. Koullick, your product is a tax-filing software; right?
> A. That's right.
> Q. It includes 1099 information is put into your application?
> A. That's right.
> Q. Other confidential information; correct?
> A. Yes.
> Q. Receipts. Personal -- personal data?
> A. Yes, as part of filing a tax return.
> Q. Can you explain some of the personal data that's put into the Keeper app application?
> A. Sure. So as part of filing a tax return, there's personal data that needs to be inputted, name, your dependents' names, addresses, you know, SSNs. There's a lot of personal data.

(Tr. 790). Mr. Kang testified that the Keeper Tax product can be connected to the user's financial accounts. (Tr. 617).

The question of similarity of the products is not whether the products are the same or interchangeable, but whether consumers are likely to attribute the respective products to a single source. *McGraw-Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1169 (7th Cir. 1986) (finding

similarity between a plaintiff's use of its marks in association with dog shows and a defendant's use of mark in association with stuffed dog toys); *Autozone, Inc. v. Strick,* 543 F.3d 923, 930 (7th Cir. 2008) (finding similarity between seller of car-wash and oil-change products and seller of car washes and oil changes); *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 680 (7th Cir. 2001) (finding likelihood of confusion between a company that manufactured measuring equipment and a company who conducted pollution testing); see also *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 958 (7th Cir. 1992) ("Modern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be 'closely related' to the senior user's.").

Accordingly, a software application that allows a user to safely prepare, store, file, and share tax documents is similar to a software application that assists a user in filing taxes. Keeper Security presented substantial evidence of the similarities between the products. No reasonable juror could reach a conclusion other than the Keeper products and the Keeper Tax products were closely related. No other conclusion is justified.

### 3. Advertised In Similar Stores or Outlets

The evidence showed that the Keeper Tax and Keeper applications were sold in the same stores and outlets, such as the Google Play store and the Apple App Store. The evidence showed that the Keeper application was advertised and sold in the Apple App Store (Dkt. 128-8, Tr. 124-26,128) and the Google Play Store (Dkt. 129-27). Keeper Tax advertised and sold its products in the Google Play Store and the Apple App Store as well. (Dkt. 129-3, Tr. 129-32). In fact, the Keeper Tax products appeared side-by-side with the Keeper Tax application in the two app stores:



(Dkt. 129-42, 129-43, 129-10, 129-20, 129-4). Keeper presented unrebutted evidence that the products at issue were advertised and sold online in the App Store and the Google Play Store:

> Q. And where were they sold?
> A. Keeper Tax, i.e., Keeper, was sold in the same channels as our products. So, on the Google Play Store, on the Apple App Store, and directly from their site on the Internet.

(Tr. 119-120; 124: "We do google search ads…We do App Store ads"). The evidence showed that the Keeper app and the Keeper Tax app were sold in the Google Play Store and the App:

> Q. And where were they sold?
> A. Keeper Tax, i.e., Keeper, was sold in the same channels as our products. So, on the Google Play Store, on the Apple App Store, and directly from their site on the Internet.

(Id. at 119-120). Mr. Koullick agreed that Keeper Tax's products were sold in the same channels:

> Q. So it's sold on your website?
> A. It is.
> Q. It's sold in the Apple App Store?
> A. It is.
> Q. And it's sold in the Google Play Store?
> A. It is.

(Id. at 735-736). Keeper Tax employee, Krislyn Chan, reiterated that Keeper Tax customers find their products online or in the App store, and that Keeper Tax advertises via Google search:

> Q. How are the major ways that prospective customers find Keeper Tax?
> A. Sure. They would primarily find us online or on the App Store. So, they would see our Web site, our app.
> Q. Does Keeper Tax run advertisements?

(Id. at 806-807).

Moreover, consumers encountered the products together when conducting searches for the word "Keeper" via Google, the Google Play Store, and the App Store. (Id. at 131, 133, 287). Counsel for Keeper Tax reiterated that the Parties' apps appear next to each other in the Apple App Store (Id. at 992). There is no dispute that Keeper and Keeper Tax's products were sold in and encountered together in the Apple App Store and the Google Play Store.

There was substantial testimony that the products competed for positioning in the Google Play Store and the App Store:

> Q. Does Keeper compete with Keeper Tax in the App Store?
> A. Yes.
> Q. How do they?
> A. By virtue of having the same search term, the same name, and also just by virtue of its placement on the store.

(Id. at 132).

> Q. Okay. Now, let's turn our attention to Plaintiff's Exhibit 47. Do Keeper and Keeper Tax compete for position in the Google Play Store?
> A. Yes.
> Q. Can you explain that?
> A. Yes. And you can see that by virtue of the search results. We're No. 1 and 2 in the search results.

(Id. at 140; Dkt. 29-17). Keeper's expert agreed:

> Q. Okay. Now do you have an opinion as to the conclusion -- do you have an opinion as to whether the Keeper product and the Keeper Tax products are advertised in the same media?
> A. I do.
> Q. And what's your opinion?
> A. Well, they're both conducting search engine optimization. They're both trying to show up in the same organic search channel. They're both trying to show up in the same app stores.

(Tr. 557). Keeper Tax agreed that the companies compete in the search results page. (Id. at 630).

Advertising in similar outlets is a factor to assess "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Am. Eagle*

- 9 -

*Outfitters, Inc,* 2013 U.S. Dist. LEXIS 180912, at *16-17. ("both parties rely primarily on their retail stores to attract foot traffic at all three malls.").

It is undisputed that Keeper and Keeper are advertised and sold in the same channels, sold in the same online marketplace, and compete for positioning within the same channels.

### 4. Keeper And Keeper Tax Have Common Consumers That Are Not Sophisticated

The evidence was unrefuted that Keeper and Keeper Tax have a common customer base. For example, Mr. Lurey testified that Keeper has a wide customer base, and that its customers do not consider much when downloading its products:

> Q. So, when a Keeper -- let me back up. When a customer is searching for the Keeper product, what is considered?
> A. When they're searching? They don't consider much. You know, they would search, and typically I would assume just download, you know, what they first come across as Keeper, and typically would install the app or maybe they purchase it directly. So, it depends on where they find us.

(Tr. 348-349). Keeper Tax failed to rebut Mr. Lurey's testimony. Additionally, there is no dispute that both Keeper and Keeper Tax have the same customer base:

> Q. So who is the Keeper app designed for?
> A. It's designed to be used by everybody, so consumers and businesses but also, you know, independent contractors. It's made for, you know, tax accountants. It's made for lawyers, real estate agents, basically anyone that has information to protect. So it's really big in financial services, anything in finance, anything that deals with money. Banking is really big, also, you know, things like court systems, law firms, accounting firms. It's really big with anything that has to be protected.

(Id. at 309). Keeper Tax agreed that their application was purchased by "tax filers," the same as Keeper's customers:

> Q. Okay. Now, the users of your app, they're all kinds of Americans; right?
> A. Sure. We've actually -- yeah, we've had over a million Americans register for Keeper Tax. And they do span – you know, they are all kinds of individuals. The majority have some sort of independent contracting or gig-work income.
> Q. And they also include tax filers, right, your customers?
> A. Yeah, they're taxpayers. That's right.
> Q. Taxpayers. And people that file their taxes.

A. They are people that file their taxes.

(Id. at 739-740). There is no dispute that Keeper and Keeper Tax have an overlapping customer case.

In assessing the degree of care exercised by consumers, "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc. v. Clean Air Engineering, Inc*., 267 F.3d 660, 683 (7th Cir. 2001). In *AutoZone*, the products sold were relatively inexpensive, and, like here, there was no evidence in the record that the customers were sophisticated. *AutoZone, Inc*. 543 F. 3d 923 at 932. (finding likelihood of confusion where there was "evidence that many of the products it sells are inexpensive…[and] there is no evidence in the record that customers of Strick's businesses are particularly sophisticated or deliberative.").

Regardless of the sophistication of the customer, initial interest confusion evidence satisfies this element. *Promatek Indus., LTD v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir. 2002). ("Initial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated."). "It is irrelevant whether this initial confusion is brief or that the confusion is eventually cured if the trademark infringement has already occurred." *Miyano Mach. USA, Inc. v. Miyanohitec Mach., Inc.,* 576 F. Supp. 2d 868, 886 (N.D. Ill. 2008). Here, Keeper Tax customers contacted Keeper Security's customer service, after learning that Keeper Security and Keeper Tax were separate companies, the customer stated "Oh, okay. That's really confusing." (Tr. 419: Dkt. 29-32, p. 1045). No reasonable jury could find otherwise.

### 5. Customers Associate The Name Keeper with Keeper Security's Products

Mr. Guccione testified that between 2011 and 2024, more than 18 million users install the Keeper application, and numerous individuals reviewed the application in the Apple App Store:

> Q. So, it's fair to say you have 18.8 million people that have downloaded the app?
> A. Installed the app, yes.
> Q. And you have over 2.9 million people that are paying to use the app?
> A. The 2.9 are part of an organizational total.

(Tr. 77-78). There have been over 100,000 reviews in the Apple App Store. (Id. at 135; Dkt. 129-27). Several million users have downloaded the Keeper app in the Apple App Store:

> Q. And how many people have downloaded your app in the Apple App Store?
> A. Several million.

(Tr. 128; Dkt. 128-8). Mr. Guccione also testified regarding the marketing budget to promote the Keeper name. Keeper invests on average $150,000 per month in Apple search and has invested nearly millions of dollars throughout the course of its existence in promoting the "keeper" name. (Tr. 134; Dkt. 128-42). Keeper has expended $66.8 million to promote the "keeper name." (Tr. 145). Keeper Tax's employee Lucia Tang did not dispute that Keeper Security's use of the Keeper name is more well-known among consumers:

> Q. So it'd be fair to say it's -- Keeper Security's use of the word "keeper" is more well-known?
> A. That seems to me to be the case based on this page, yes.

(Id. at 507).

"The stronger the mark, the more likely it is that encroachment on it will produce confusion." 2 *McCarthy* § 11.73, at 11-169 to 170 (2008); *AutoZone, Inc.*, 543 F.3d at 543. The strength of a mark usually corresponds to its economic and marketing strength. *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004). In this case, the evidence in the record is more than sufficient to support the conclusion that the KEEPER® mark has plenty of economic and marketing

strength. Thus, there is no reasonable basis that a jury could find anything but a significant number of consumers associate the name "keeper" with products offered by Keeper Security.

### 6. Keeper Presented Unrebutted Testimony Of Actual Confusion

Keeper Security presented substantial evidence of actual customer confusion. "Actual confusion is the best evidence of likelihood of confusion." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1090 (7th Cir. 1988); see also *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 383 (7th Cir. 1976). "Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Id.* Customer complaints are substantial evidence of consumer confusion. *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.,* 87 F.3d 654, 661 (4th Cir. 1996). Brief confusion as to the source of the goods can result in loss of goodwill to the senior user. *Promatek Indus., LTD v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir. 2002).

Here, Keeper's customer service manager, TingTing Gong, testified regarding numerous instances of confusion that had been reported by Keeper Tax customers to Keeper's customer service representatives. Ms. Gong testified that since 2019, Keeper Security has received over 290 customer service complaints from Keeper Tax customers. (Tr. 391; 385-388; Dkt. 129-26; 129-32). There were numerous instances of Keeper Tax customers contacting the Keeper through the Keeper website thinking they were contacting Keeper Tax. (Tr. 396-399: "Please delete my account and all personal information I have connected with Keeper Tax."; (Id. at 400): "This email was supposed to go to Keeper Tax. The name is similar."). For example, Keeper Tax customers stated that they were confused by the Keeper names:

> Q. And above that is the response from the Keeper Tax customer. What does that say?
> A. She said, "Wow, so sorry about the confusion. Thanks for your help."

> Q. And then can you read above, the words -- what does that say?
> A. They said, "My apologies. I seem to have mistaken you guys with Keeper Tax. I'm sorry. Those guys stole money from me, not you guys. My apologies again."

(Id. at 401-403). Keeper Security also admitted a series of audio recordings where Keeper Tax customers are calling Keeper Security's customer service about the source of products offered by Keeper Tax, which showed confusion as well. (Dkt. 132, PTX 125, 135, 143)( electronically filed).

Keeper Tax offered no evidence to rebut Keeper's evidence of actual confusion. Keeper Tax's counsel, however, proceeded to argue at closing, without support, that Keeper's evidence did not amount to any actual confusion. (Tr. 996-97). Keeper presented substantial unrebutted evidence of actual confusion. A reasonable juror could not find there was anything but actual confusion.

### 7. Keeper Tax Intended To Pass Off Its Product As That Of Keeper Security And Intended To Confuse Customers

Notably, the Seventh Circuit has established that "[i]ntent to deceive or to confuse is not necessary to prove trademark infringement." *CAE, Inc.* 267 F.3d at 686. Nonetheless, Keeper Security demonstrated that Keeper Tax employees intended to benefit from using a trademark with pre-established goodwill.

Mr. Koullick testified that Keeper Tax was aware of Keeper and its federal trademark:

> Q. And you knew they were called Keeper?
> A. We knew that their product was called Keeper.
> Q. And you knew they had a federal registration in the name Keeper?
> A. We knew that they had a trademark for the term Keeper in their industry.
> Q. And knowing that, you decided to go forward with the name Keeper?
> A. I did.

(Tr. 732). Keeper Tax also knew Keeper was using the word "Keeper":

> Q. But it's true that around June 10th, 2022, Keeper Tax found out about Keeper Security, correct?
> A. Yes.

> Q. And they found out that they were using the name Keeper as their trademark?
> A. We didn't, no, dig into the trademark specifics. We knew that Keeper Security existed.
> Q. You knew that Keeper Security was out there and that they were using the name Keeper?
> A. That's right.

(Id. at 599). There was more. Keeper Tax's COO testified that he was concerned that Keeper Tax would be confused with Keeper if Keeper Tax changed its name to just "keeper."

> Q. And lastly, "It's not going to get confused with other companies, example, Keeper with Keeper Password." Do you see that?
> A. I do.
> Q. So, as of June 6, 2022, you had a concern that Keeper would be confused with Keeper Password, right?
> A. Initially, I had that concern.
> Q. And let's look at the third option again. It says, "It's not going to get confused with other companies, example, Keeper with Keeper Password," right?
> A. That was my initial thought.
> Q. So, there was a concern that Keeper would get confused with Keeper Password, is that correct?
> A. Right.

(Id. at 607; Dkt. 129-9).

The evidence showed that Keeper Tax began identifying its products under the name "keeper" while maintaining concerns that doing so would cause consumer confusion. No reasonable juror could find otherwise.

### III.  KEEPER IS ENTITLED TO A JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE A NEW TRIAL

For the foregoing reasons, under Rule 50(b), Keeper is entitled to judgment as a matter of law because no there was no legally sufficient basis for a reasonable jury to find for Keeper Tax on the issue of trademark infringement. *Campbell v. Miller,* 499 F.3d 711, 719 (7th Cir. 2007). In the alternative, for the same reasons as set forth above, Keeper is entitled to a new trial, because the jury's verdict was against the manifest weight of the evidence. *Glickenhaus & Co. v. Household Int'l, Inc.,* 787 F.3d 408, 414 (7th Cir. 2015).

IV.	CONCLUSION

Keeper respectfully requests this Court grant its renewed motion for judgment as a matter of law, because Keeper Security presented extensive evidence supporting a likelihood of confusion, all of which was unrebutted by Keeper Tax.

.

Dated: October 28, 2024	Respectfully submitted,

/s/	Dean D. Niro
Dean D. Niro (dniro@vvnlaw.com)
Nicholas Niro (nniro@vvnlaw.com)
Vitale, Vickrey, Niro, Solon & Gasey LLP
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
(312) 236-0733
(312) 236-3137 Facsimile

**Attorneys for Plaintiff Keeper Security, Inc.**