IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEEPER SECURITY, INC., | ) | |
| | ) | Case Number: 1:23-cv-01043 |
| Plaintiff, | ) | |
| | ) | Judge LaShonda A. Hunt |
| v. | ) | |
| | ) | Magistrate Judge Maria Valdez |
| KEEPER TAX INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
<u>RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

Plaintiff Keeper Security, Inc.'s ("Plaintiff") Renewed Motion for Judgment as a Matter of Law should be quickly and decisively denied. That motion gives only a selective and partial account of the evidence presented at trial, and an accurate and complete review of that evidence shows that the jury had many reasonable ways to conclude that confusion between Plaintiff and Defendant Keeper Tax Inc. ("Defendant" or "Keeper Tax") or their products was not likely. The jury's verdict was correct and reasonable, and there are no grounds to negate it after the fact.

**I.  The Legal Standard for Granting Judgment as a Matter of Law**

Plaintiff provides an incomplete and skewed account of the high standard which must be met before a court can grant judgment as a matter of law under Fed. R. Civ. P. 50. Under that Rule, a court can grant such judgment if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue." *Id*. In deciding whether that high standard has been met, the court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence. The court does not make credibility determinations or weigh the evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) (citations

1

omitted). In other words, the court must decide "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Martin v. Milwaukee County*, 904 F.3d 544, 550 (7th Cir. 2018) (quoting *Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 707 (7th Cir. 1999)).

That Rule 50 standard is particularly difficult to meet in the context of a verdict for or against a likelihood of confusion for trademark infringement purposes. As Plaintiff states (Plaintiff's Renewed Motion for Judgment as a Matter of Law, ECF No. 141 ("Plaintiff Brief"), p. 2), the Seventh Circuit has set out seven factors to consider in assessing likelihood of confusion. At the same time, "[n]one of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1087 (7th Cir. 1988)). As a result, the trier of fact decides how much weight to give each factor based on the specific facts of the case. *See* Final Jury Instruction No. 17, ECF No. 118 ("The weight to be given to each of these factors is up to you to determine. No particular factor or number of factors is required to prove likelihood of confusion."). In turn, this means that the proponent of a judgment as a matter of law overruling a jury verdict faces the unusually high burden of showing that no reasonable combination of factors *and* weight given to those factors could possibly result in the verdict the jury actually returned.

II.     **Plaintiff is not Entitled to Judgment as a Matter of Law Overturning the Jury's Verdict of No Likelihood of Confusion.**

Plaintiff's Brief gives a limited and one-sided description of the evidence presented at trial. In no sense did Plaintiff submit "overwhelming, and unrebutted, evidence in support of each

likelihood of confusion factor." Plaintiff Brief p. 2. Instead, the evidence presented at trial could have allowed a reasonable jury to conclude that most or all of the individual likelihood of confusion factors strongly disfavored Plaintiff's position, or were neutral, or at best only slightly favored Plaintiff's position. Those facts, combined with the jury's ability to determine the weight that should be given to each of the seven factors, gave the jury multiple overlapping ways to reasonably conclude that overall confusion was not likely. The jury's verdict should stand.

### A. Similarity of the Parties' Marks

Based on the significant evidence Plaintiff's Brief omits and misdescribes regarding the similarity of the parties' marks, the jury could have reasonably concluded that those marks did not create the same commercial impression or that any similarity in that impression did not weigh heavily toward finding a likelihood of confusion. While there was no dispute that the parties' marks each consisted of the word "keeper," spelled and pronounced the same way, that is not the end of the mark similarity analysis. The jury could have credited the possibility, ignored in Plaintiff's Brief, that the same word had very different meanings in the context of the parties' different products. For Plaintiff's products, Plaintiff's CEO Darren Guccione said that the word conveys the idea of "something that kept or keeps your passwords and private information safe." Trial Transcript, attached hereto as Exhibit A ("Tr.") at 46:15-16. For Defendant's product, David Kang testified that the word conveyed that Defendant's product did tax-preparation work that a bookkeeper would traditionally do. Tr. 630:25-631:7. The jury could have reasonably concluded that these different meanings created different commercial impressions.

The jury could have also concluded that because they were comparing how the parties' marks were encountered in the marketplace, and not in an abstract comparison, the very different stylistic components of those marks argued against a likelihood of confusion. Plaintiff

3

significantly mischaracterizes the evidence when it states that the disputed marks "use the same font, and appear in lower-case letters." Plaintiff Brief p. 4. The evidence actually showed that, at least for the past few years, the parties used stylized logos of their marks which are significantly different in font, case, and related graphic elements. A comparison of those logos shows their numerous differences:



Plaintiff's logo, in all capital letters and next to the "Circle K" graphic, appears on the header of each page on Plaintiff's website. *See* DX36 (ECF No. 128-11). Defendant's logo, in lower-case letters of a different font and next to a three-star graphic, appears on the header of each page of its own website. *See* PX2 (ECF No. 129-2). In the much-discussed place where the parties' marks are shown next to each other, namely the search results for "keeper" in the Apple App Store, the very different graphic elements and app descriptions create very different commercial impressions. *See* DX32 (ECF No. 128-9). In light of all of these differences between the parties' marks in meaning and marketplace appearance, the jury could have reasonably concluded that the marks did not create the same commercial impression, or that any similarity in that impression did not weigh heavily toward finding a likelihood of confusion.

B.  **Similarity of the Parties' Products**

The evidence presented by the parties gave ample room for the jury to reasonably conclude that their respective products were not at all related and were not likely to be seen as coming from

4

the same source. On the most basic level, there was no evidence that Plaintiff and Defendant are direct competitors or have products which do the same things. Defendant's product is essentially tax-filing software, like TurboTax or H&R Block. Tr. 751:7-9. Plaintiff's consumer-focused product consists of a password manager and a digital vault for storing digital files. Tr. 159:24-160:2.

At trial and in the present motion, Plaintiff has attempted to portray the digital vault feature of its software as something that customers can "use" to file their taxes. However, at trial Mr. Guccione admitted that the digital vault is designed to hold *any* type of digital file, meaning that it is simply a general-purpose tool with respect to file storage. Tr. 161:20-162:12. Similarly, Plaintiff's CTO Craig Lurey admitted that the only way a customer could "use" the digital vault to file taxes would be to store digital documents and share those documents with their accountant or tax preparer. Tr. 351:21-352:17. The jury could have recognized that this functionality has nothing specific to do with the tax filing process, and that users of Plaintiff's software can actually store and share with a designated individual any type of digital file for uncountable different purposes.

In light of this evidence, the jury would have been perfectly justified in deciding that the public would not assume a combination password manager and general-purpose digital file vault would come from the same source or company as tax-filing software. Certainly Plaintiff offers no reason, beyond conclusory assertions, why a rational jury could *only* conclude that these products would be seen as coming from the same source. Contrary to Plaintiff's claim in its brief, it did not offer "substantial evidence that the parties offered products which consumers attributed to a single source." Plaintiff Brief p. 5. Plaintiff offered no surveys or other indication of what consumers believed or assumed about the relatedness of the source of the parties' products. Given the

5

differences in basic functionality between the parties' products, the more reasonable conclusion would be that consumers would not assume them to come from the same source. The jury would have been justified in finding that this factor argues strongly against a likelihood of confusion.

    **C.**     **Similarity of Sales Outlets and Marketing Media**

There was no factual dispute that both parties' products are offered on both the Apple App Store and the Google Play Store. However, the jury heard sufficient evidence to allow it to reasonably conclude that the parties' products being sold in those outlets was not a significant factor in the likelihood of confusion analysis. First, the ubiquity of those two app stores makes it unsurprising that the parties' respective apps could both be found there. Pretty much any legitimate company that has a mobile application for the iOS or Android operating systems makes that app available in the respective one of those two stores. As a result, the jury could reasonably conclude that consumers would not put any weight on both parties' products being in those stores as an indication that they came from the same source.

In addition, the way that the parties' products appear within those stores significantly decreases the likelihood that consumers would believe they came from the same company. Throughout the trial the jury heard repeated discussions about how the parties' products would appear next to each other if a user did a search for the word "keeper" in either of those app stores. One example of such a search result page is at DX32 (ECF No. 128-9). Both the bold and smaller text surrounding the word "keeper" in each of the parties' results makes it clear that the apps do completely different things (password management and tax filing), and the very different graphic portions of each company's logo appear next to those words, further implying that these apps come from different companies. *See id*. In addition, these are just the first two of numerous other apps with "keeper" in the name shown in these search results. Those other apps, which do still other

very different things and have very different logos, reinforce the idea that the word "keeper" alone does not signal that different products originate from the same company. In light of all of these facts, the jury could reasonably have concluded that the parties' products being sold in Apple App Store and Google Play Store was not a significant factor in the likelihood of confusion analysis.

### D. Consumer Degree of Care

Defendant presented sufficient evidence at trial for the jury to have reasonably concluded that consumers of the parties' products would exercise a relatively high degree of care in the purchasing process. First, the jury heard evidence that Defendant's product costs approximately $192 for a one-year subscription. Tr. 754:8-12. Consumers are more likely to be careful about purchases as the price of the product rises, *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985), and the jury could have concluded that the price of Defendant's tax preparation product is high enough that it would cause an elevated degree of consumer care. In addition, both parties' products are likely to be used for purposes that require greater than usual consumer trust in the product, which in turn causes customers to exercise a high degree of care in selecting those products. Mr. Guccione testified that it is very important that customers trust Plaintiff's product, because it is used to shield and safeguard information or documents which the customers want to keep safe and confidential. Tr. 154:19-155:10. Mr. Koullick testified that users of Defendant's product input into it personal and confidential financial information such as names, social security numbers, and information about income and assets. Tr. 789:22-790:12. The jury could have reasonably concluded that those products' relationship to protecting the customer's confidential information would cause those customers to use a high degree of care when selecting them.

Plaintiff offers no reason why a reasonable jury would be compelled to conclude that relevant consumers would exercise a low degree of care. Mr. Lurey's speculation that customers

7

"don't consider much" when searching for Plaintiff's product (Plaintiff Brief p.10) is not backed up by any actual evidence, and as such the jury would have been justified in ignoring it. Plaintiff's assertion that it and Defendant "have the same customer base" (*id*.) also fails as compelling evidence that Defendant's customers exercise a low degree of care. First, this was not actual evidence that Plaintiff and Defendant share any, much less a significant number, of customers. Instead, it is simply separate statements that Plaintiff's product is "designed to be used by everybody" and Defendant's product is used by "all kinds of Americans" who file taxes. *Id*. Assuming these statements are true, they merely allow for the possibility of some customer overlap, but do not prove any particular level of overlap. Second, even if the parties' customer bases did overlap, this would not prove anything about the level of care any of those customers take in thinking about the origin of the parties' products. In sum, Plaintiff offers no reason why a reasonable jury must conclude that relevant customer exercise a low degree of care, while Defendant offered evidence on which a reasonable jury could conclude that those customers exercise a high degree of care. The jury would have therefore been justified in weighing this factor solidly against a likelihood of confusion.

   E.   **Degree of Consumer Association of "Keeper" with Plaintiff**

The evidence presented at trial could have permitted a reasonable jury to conclude that the degree of consumer association of the mark KEEPER with Plaintiff's products was small enough that it did not have a significant effect on the likelihood of confusion issue. Plaintiff's evidence for the purported strength of its mark consisted primarily of the numbers of individuals who have installed Plaintiff's mobile app and the amount of money Plaintiff has spent on marketing, both over the 14 years prior to trial. Plaintiff Brief p. 12. However, the 18 million people who have installed Plaintiff's app are spread over all of those years, include irrelevant users outside the

8

United States (as Mr. Guccione testified that only 60% of Plaintiff's revenues come from within the U.S.; Tr. 179:8-20), and are not a particularly high percentage of the hundreds of millions of U.S. consumers. In addition, the vast majority of the $67 million Plaintiff apparently spent on marketing was done in just the past few years, as shown by PX79 (ECF No. 129-24). In light of these additional facts, the numbers Plaintiff describes do not compel the conclusion that consumers strongly associate the KEEPER mark with Plaintiff.

Plaintiff's argument also ignores the wide difference in the types of things the parties' products do. In other words, to the extent that there was some low level of customer association of KEEPER with Plaintiff's products, that association was with respect to the areas of password management and cybersecurity. The jury could have easily concluded that such recognition would not extend to or imply an association with tax filing software. Finally, Plaintiff argues to the wrong standard when it claims that "the evidence in the record is more than sufficient to support the conclusion that the KEEPER® mark has plenty of economic and marketing strength." Plaintiff Brief pp. 12-13. Because Plaintiff is seeking a judgment as a matter of law which would essentially reverse the jury's conclusion, it must actually prove that "a reasonable jury would not have a legally sufficient evidentiary basis to find for [Defendant] on that issue." Fed. R. Civ. P. 50. Showing that the jury *could* have found for Plaintiff is not enough. Here, the jury could have found that Plaintiff's KEEPER mark had a moderate or low level of relevant consumer recognition, and that consequently this factor was no more than neutral in the likelihood of confusion analysis.

F.     **Alleged Actual Confusion**

The jury would have been justified in concluding that the alleged instances of actual confusion Plaintiff claimed occurred were either not relevant actual confusion or were too insubstantial to indicate that a significant number of consumers were likely to be confused. Every

9

one of the approximately 290 instances Plaintiff identified as actual confusion were in the context of alleged existing Keeper Tax subscribers contacting Plaintiff's customer service. None were in the context of any consumer purchasing one party's product while erroneously thinking it was the other party's product. Tr. 421:23-422:3. More importantly, most or all of them did not display any confusion about the *source* of the Keeper Tax product they were calling or writing about. One example of such a customer was Anthony Berardi, who upon receiving a confirmation email that he had contacted Plaintiff (Keeper Security), immediately apologized and said that he had intended to contact another company (meaning Keeper Tax). PX102 (ECF No. 129-26) at pp. 1-2; Tr. 439:25-441:20. The jury could believe that Mr. Berardi was not confused about the source of his Keeper Tax subscription, but instead he just contacted the wrong company when trying to ask a question about it. The customer named Brittany Kent demonstrated the same pattern. *See* PX102 at pp. 3-5.

Even if most or all of the instances which Plaintiff portrays as actual confusion were genuine instances of such, the evidence showed that they were a tiny fraction of the overall customer support requests Plaintiff received during the relevant years. For example, in 2023 the customer support requests Plaintiff received from what it identified as Keeper Tax customers were 0.0003, or three hundredths of one percent, of the total number of support requests Plaintiff received, and in 2022 the support requests from Keeper Tax customers were 0.0002, or two hundredths of one percent, of Plaintiff's received support requests. Tr. 436:20-438:23. The jury could have reasonably concluded that any actual confusion was even less than these numbers indicate, if most or all of the alleged incidents did not actually demonstrate confusion about the source of the customer's product. In any case, the jury could have concluded that the instances of actual confusion, if any, were far too few to support the idea that significant numbers of customers

were likely to be confused overall.  The jury would therefore have been justified in reasonably concluding that the alleged instances of actual confusion were neutral or at most slightly favoring an overall likelihood of confusion between the parties' products.

### G. Defendant's Intent to Confuse Customers or Pass Off its Product as Plaintiff's

The evidence presented at trial was more than sufficient for the jury to conclude that Defendant and its officers had absolutely no intent to confuse customers or pass off their tax preparation software as coming from Plaintiff.  When Defendant's co-founders Mr. Koullick and Mr. Kang were picking a company name, neither one of them had heard of Plaintiff or its products, and they chose the name "Keeper Tax" because their product was intended to do some of the things a bookkeeper would, and they wanted to imply that with it customers could "keep" more of their money.  Tr. 630:25-631:12; 757:7-10.   The evidence further showed that in the summer of 2022, Defendant engaged in a brand refresh evaluation which ultimately resulted in changing its public-facing name and mark from "Keeper Tax" to just "Keeper."  Tr. 732:1-10.  Defendant's reasons for undertaking that evaluation were based on wanting to move to a more serious image within the tax-filing industry.  Tr. 759:13-760:3.  As part of that process, Defendant conducted its own brainstorming sessions (Tr. 743:17-744:6), hired a branding agency (Tr. 824:17-825:11), and carefully considered whether the name change would cause problems with other companies which used the name and mark "Keeper."  Tr. 770:20-773:11.  Mr. Koullick specified that during that process he determined that there was little chance of confusion problems with Plaintiff's KEEPER product because the industries Plaintiff and Defendant were in were so different.  Tr. 773:3-19.  The jury could reasonably conclude that all of the motivations and thoughts behind the 2022 renaming process were focused on Defendant and its position in and relationship to other companies in the tax preparation industry.

Defendant applied for a federal trademark registration for KEEPER TAX when that was its name and mark, and asked to change the application to just KEEPER after reaching a conclusion about the 2022 rebrand. DX71 (ECF No. 128-24); Tr. 783:10-785:7. The jury could have concluded that this is not something a company would have done if it were trying to pass its product off as that of another company that had it own trademark registration, since it would not want the experts at the U.S. Trademark Office to compare those companies' usages. In addition, Defendant engaged in some Google Search advertising for its name "Keeper," but it specifically excluded its Google Search ads from showing up in specific searches for things like "Keeper passwords" and "Keeper Security." Tr. 814:7-815:24. Again, the jury could have concluded that this was not the action of a company that wanted to associate itself with Plaintiff or benefit from people searching for Plaintiff's products.

In contrast, Plaintiff fails to point to evidence which indicates any significant intent on Defendant's part to confuse consumers or pass its product off as coming from Plaintiff. The most that Plaintiff's cited evidence shows is that during the 2022 rebranding process Defendant's employees knew about Plaintiff and its KEEPER trademark, and that some Defendant employees had some *initial* concerns about confusion with Plaintiff. Plaintiff Brief pp. 14-15. There is no evidence, however, for Plaintiff's mischaracterization that Defendant was "maintaining" those concerns when it actually rolled out its name change. *Id*. at 15. Instead, Mr. Koullick made clear that he carefully thought about and decided such concerns were groundless during the process. Tr. 770:20-773:11. From all of the evidence discussed above, the jury could have concluded that Defendant and its officers had absolutely no intent to confuse customers or pass off its tax preparation software as coming from Plaintiff. It would have been fully justified in deciding that this factor strongly weighed against a likelihood of confusion.

**H.     The Jury Had Multiple Reasonable Paths to its Verdict of No Likelihood of Confusion.**

In light of all of the evidence discussed above, there are multiple overlapping ways or paths that a reasonable jury, considering the evidence and deciding how much weight to give each factor, could have come to the conclusion that relevant consumers are not likely to be confused about the source or origin of Defendant's product.  For example, it could have concluded that the differences in the products and the lack of Defendant's intent to cause confusion strongly disfavored a likelihood of confusion, that the similarity of the marks and the claimed instances of actual confusion slightly favored that likelihood, and that the remaining factors were neutral.  Because the jury could decide how much weight to give each factor, it could have given more weight to the factors that disfavored a likelihood of confusion, leading to an ultimate conclusion that no such confusion was likely.  Alternatively, the jury could have made many of those same evaluations, but instead decided that the similarity of the marks was neutral and that the expected degree of customer care in evaluating the parties' products disfavored a likelihood of confusion.  Again assigning relative weight to all seven factors, the jury could reasonably conclude that no overall confusion was likely.  These are just two of the many ways that the jury could have reasonably come to its finding of no likelihood of confusion.  Under the legal standard for granting a judgment as a matter of law overturning the jury's verdict, the existence of only one of those many ways compels a denial of Plaintiff's motion.  This Court should refuse to disturb the jury's verdict.

**Conclusion**

This Court should deny Plaintiff's Renewed Motion for Judgment as a Matter of Law.

Respectfully submitted,

KEEPER TAX INC.

Date: November 18, 2024         By:     /s/ Mark R. Bagley
                                        Mark R. Bagley
                                        Brett M. Tolpin
                                        TOLPIN & PARTNERS, PC
                                        30 North LaSalle Street, Suite 1510
                                        Chicago, Illinois 60602
                                        (312) 698-8971

                                        *Attorneys for Defendant Keeper Tax Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing **MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW** was served via the Northern District of Illinois electronic filing system to:

> Dean D. Niro
> Nicholas D. Niro
> VITALE, VICKREY, NIRO, SOLON & GASEY LLP
> 311 S. Wacker Dr., Suite 2470
> Chicago, Illinois 60606

on this 18th day of November, 2024.

                                                  /s/ Mark R. Bagley
                                                  Mark R. Bagley