**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KEEPER SECURITY, INC., | |
| Plaintiff, | |
| v. | Case No. 23 C 1043 |
| KEEPER TAX INC., | Hon. LaShonda A. Hunt |
| Defendant. | |

**MEMORANDUM ORDER AND OPINION**

Plaintiff Keeper Security, Inc. sued Defendant Keeper Tax Inc. for trademark infringement based on Defendant's use of the mark "Keeper". After a five-day trial, the jury returned a verdict in Defendant's favor. Currently before the Court are Plaintiff's renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) (Dkt. 140), and motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) (Dkt. 137). For the reasons discussed below, Plaintiff's motions are denied.

**BACKGROUND**

Plaintiff filed this lawsuit for trademark infringement against Defendant on February 21, 2023.[1] (Compl., Dkt. 1). Plaintiff asserted claims for trademark infringement under Lanham Act § 32(a) (Count 1), unfair competition and false designation of origin under Lanham Act § 43(a) (Count 2), trademark dilution under Lanham Act § 43(c) (Count 3), common law trademark infringement and unfair competition (Count 4), violation of the Illinois Deceptive Trade Practices Act (Count 5), and unjust enrichment (Count 6). (*Id.*) The Court entered partial summary judgment

---

[1] Plaintiff filed a petition for cancellation of Defendant's trademark with the USPTO on May 25, 2023, citing priority and likelihood of confusion as the grounds for cancellation. (PX 201). The cancellation proceeding was stayed pending the outcome of this case. (Tr. 746-747).

in favor of Defendant on the trademark dilution claim (Count 3), (Minute Entry, Dkt. 77), and the parties stipulated that if Plaintiff fails to establish Defendant's liability for trademark infringement under Count 1, then Defendant is not liable for any of the remaining claims under Counts 2, 4, 5, and 6, (Stipulation, Dkt. 96). The jury trial took place from September 23-27, 2024. (Minute Entries, Dkts. 112, 114, 115, 116, 121).

## I.     <u>Trial Testimony and Evidence</u>

Plaintiff designs, creates, and sells cybersecurity software that stores and secures passwords, documents, and other private information. (Tr. 43, 52). Darren Guccione and Craig Lurey founded the company in 2009 and chose the name "Keeper Security" because it was simple, easy to remember, and invoked trust. (Tr. 43, 46). Plaintiff's products are offered for sale directly on its website and through mobile app stores. (Tr. 56). Customers are given access to the product for free for 30 days and charged a subscription fee after that for premium features. (Tr. 54).

Plaintiff filed a trademark application for the term "Keeper" in 2011. (Tr. 57). The trademark was registered on May 24, 2011, and is for use with computers and mobile telephones for electronic storage and encryption of passwords and private data. (Tr. 58-59; PX 1). It consists of standard characters without claim to any particular font, style, size, or color. (*Id.*)

Defendant sells tax-filing software for "gig workers" such as rideshare and delivery drivers and dog walkers. (Tr. 751). A key feature of Defendant's product is that the software connects to the user's bank account and automatically identifies transactions that qualify as eligible business deductions. (Tr. at 752). David Kang and Paul Koullick founded the company in 2018. (Tr. 750-751). They originally picked the name "Keeper Tax" because it references the term "bookkeeper" and the product helps users "keep" more of their earnings. (Tr. 756). The software is available

through Defendant's website and a mobile application. (Tr. 754). After a seven-day free-trial period, customers must pay to use the product. (Tr. 480). The annual fee is $192. (Tr. 754).

As part of a rebranding in 2022, Defendant shortened its name from "Keeper Tax" to "Keeper". (Tr. 722). In making the decision to change its name, there were discussions about other companies using the word "Keeper" in their name, including Plaintiff (Keeper Security) and other businesses with the websites "keeper.app" (another tax filing service) and "keeper.com" (a menstrual cup company). (Tr. 593, 765, 768; DX 12; DX 35). Internal company conversations showed that Defendant was not concerned about keeper.app because, although they were in the same industry, it did not have a trademark for "Keeper". (Tr. 762). With respect to Plaintiff, Defendant was not concerned about any trademark infringement because they were in a different industry. (Tr. 772).

Defendant initially filed a trademark application for the term "Keeper Tax" in 2021. (DX 71). Subsequently, Defendant changed the mark to "Keeper" to align with the new, shorter name. (Tr. 784). The trademark was registered on May 16, 2023, and is for use with goods and services for tax-filing services for self-employed individuals. (Tr. 786; DX 2). It consists of standard characters without claim to any particular font, style, size, or color. (*Id.*)

## II. <u>Juror Question</u>

On the fourth day of the trial, Plaintiff began questioning its expert witness regarding damages. After the parties had ended a sidebar with the Court about an exhibit the expert was discussing, a juror raised a hand and said, "Excuse me. I have a dumb question. I don't want to ask . . . I can . . . I don't know if I can ask it." (Tr. 662). After the Court responded that the juror could write down the question, the juror did so and handed the note to the Courtroom Deputy. (*Id.*)

The note said, "Question to Judge: Is it necessary to understand damages, if infringement as not occurred?" (Tr. 663; Dkt. 117).

The Court took a break and discussed the question with counsel outside of the presence of the jury. During that exchange, Plaintiff moved to excuse the juror on the basis that the juror's mind was already made up. (Tr. 663-664). In light of the timing (i.e., during testimony about damages), the Court did not read the question to mean that the juror had made up the juror's mind and therefore denied the motion and declined to ask the juror any follow-up questions. (Tr. 664). This was especially so because a few minutes before the question was asked, Plaintiff's expert testified that "the assumption you have to make for damages is that [Defendant] is liable for infringement." (Tr. 656:16-19). Once proceedings resumed in open court with the entire jury present, the Court re-read Preliminary Jury Instruction No. 3, which stated, among other things, that "[Y]ou must not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then." (Tr. 666). The Court also re-read Preliminary Jury Instruction No. 20 regarding the order of the trial. (*Id.*)

Later the same day, Plaintiff moved for a mistrial on the basis that there was no longer an impartial jury due to the way the juror asked that question. (Tr. 712). According to Plaintiff's counsel, the juror "irreparably prejudiced the jury" because the juror "stood up, waived a piece of paper," "interrupted the jury at its critical time when the damage expert just began[,]" and "made a spectacle." (Tr. 711-712). The Court summarily denied Plaintiff's motion and corrected counsel's factually inaccurate description of the juror's conduct. (Tr. 712-713). Specifically, the Court reminded counsel that jurors had been regularly encouraged to stand up and move around during sidebar discussions between counsel and the Court, and to also raise their hands if they

4

needed to ask a question. In this instance, the Court pointed out that it did not recall the juror standing up as Plaintiff described. Rather, the juror raised a hand, and once recognized by the Court, inquired about asking a question. The juror then followed the Court's instructions and while seated, wrote down the question, but at no time did the juror act in any way that could be characterized as a "spectacle." (*Id.*) In addition, the Court explained that there was no reason to believe that the juror's conduct had affected other jurors or was based on any evidence outside of the courtroom. (Tr. 714). The question came at a time when Plaintiff's fact witnesses had finished testifying and its damages expert was discussing what needed to be proven to show infringement. (Tr. 715). And the preliminary instructions previously read to the jury discussed what was necessary to prove infringement but not damages. (*Id.*; Preliminary Instruction No. 17, Dkt. 113) In that context, the Court commented to counsel that the question could quite reasonably be read to ask, "Where does this expert fit into this?" or "Where does this damages testimony fit into all of this?" (*Id.*)

## III.    <u>Procedural History</u>

At the close of evidence, Plaintiff moved for judgment as a matter of law on the issue of likelihood of confusion, Defendant moved for judgment as a matter of law on the issues of whether Plaintiff is entitled to a reasonable royalty and punitive damages,[2] and the Court took the motions under advisement. (Tr. 948-949). Ultimately, the jury returned a verdict in Defendant's favor, finding that Defendant was not liable for trademark infringement. (Verdict Form, Dkt. 120). After trial, Plaintiff filed the instant renewed Rule 50(b) motion for judgment as a matter of law (Dkt. 140) and Rule 59(a) motion for new trial (Dkt. 137). These motions are fully briefed.

---

[2] In light of the verdict and this ruling, Defendant's motions are terminated as moot.

## DISCUSSION

**I.** **Renewed Motion for Judgment as a Matter of Law**

**A.** **Legal Standard**

Under Federal Rule of Civil Procedure 50, a court may enter judgment as a matter of law against a party on a claim or defense if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on an issue essential to the claim or defense. Fed. R. Civ. P. 50(a). A party may move for judgment as a matter of a law against a party after the opposing party has been fully heard on an issue during a jury trial. *Id.* If an original motion for judgment as a matter of law is not granted, a party may renew the motion after trial. Fed. R. Civ. Pro. 50(b).

In ruling on a Rule 50(b) motion, the court should review all of the evidence in the record, and all reasonable inferences must be drawn in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Evidence must be construed "strictly in favor of the party who prevailed before the jury and examine[d] . . . only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012). The court must not make credibility determinations or weigh the evidence, and evidence favorable to the moving party that the jury was not required to believe should be disregarded. *Id.* If the evidence presented was sufficient to support the verdict under those standards, the verdict should stand. *Campbell v. Miller*, 499 F.3d 711, 716 (7th Cir. 2007). "[A] verdict supported by no evidence or a mere scintilla of evidence will not stand." *Martin v. Milwaukee Cnty.*, 904 F.3d 544, 550 (7th Cir. 2018).

### B.     <u>Trademark Infringement</u>

To prevail on a claim for trademark infringement under the Lanham Act, a plaintiff must establish that its mark is protectable[3] and that the opposing party's use of the mark is likely to cause confusion among consumers. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811-812 (7th Cir. 2002), *as amended* (Oct. 18, 2002). Seven factors are generally considered in assessing the likelihood of confusion: "(1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's." *Id.*; *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897-898 (7th Cir. 2001); *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000); *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1087 (7th Cir. 1988). Although no single factor is dispositive and the appropriate weight of each will vary by case, "the similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance." *Promatek*, 300 F.3d at 812.

Because Plaintiff argues that there is no legally sufficient evidentiary basis for a reasonable jury to have found in Defendant's favor on the issue of likelihood of confusion, the Court will address the evidence presented on each factor and the parties' respective arguments in turn.

### 1.     <u>Similarity of the Marks</u>

When evaluating similarity of the marks, courts focus on "[t]he commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail[,]" *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 848 (7th Cir. 2023) (quoting *Estate of*

---

[3] It is undisputed that Plaintiff's mark is valid and protectable.

*P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-546 (1920)), and therefore "compare the marks in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Grubhub*, 80 F.4th at 848 (quoting *AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008)). In this regard, "a court may assess the similarity of the sound, sight, or meaning of the marks." *Id.* at 848. "[W]hen the public does not encounter the two marks together, it is inappropriate to focus on minor stylistic differences to determine if confusion is likely." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997), *abrogated on other grounds*, *Grubhub*, 80 F.4th at 848 n.12. Similarities in font, size, and other visual design elements are relevant considerations, however, they are not the only considerations. *See, e.g., AutoZone*, 543 F.3d at 930 (comparing similar visual elements but also discussing dissimilarities such as color and accompanying words).

Here, Plaintiff argues that no reasonable juror could find that the parties' marks are not similar because they are pronounced the same way, use the same font, and appear in lower-case letters. Defendant responds that there is no dispute regarding those basic similarities but the jury could have relied on evidence of different meanings of the word "Keeper" in the context of the parties' products. In addition, Defendant points to the parties' use of the mark over the last several years, during which the font, color, and case differed from Plaintiff's, all of which resulted in noticeable dissimilarities online and in mobile app stores.

The jury heard testimony that use of the word "Keeper" in connection with Plaintiff's products invokes trust and the idea of something that keeps passwords, documents, and other private information safe. Conversely, there was testimony that use of the word "Keeper" with Defendant's product would make a consumer think about services offered by a bookkeeper and keeping more of their money. Furthermore, although the parties' marks do both consist of the word

8

"Keeper," the appearance of each party's use of that word the appearance of that word has varied over time and they have not always looked similar. One version of Defendant's mark used font that was similar but not the same as Plaintiff's "legacy" mark (that it no longer uses), but the parties' more recent uses contain notable differences in capitalization, font, color, and other visual elements. And critically, in the relevant marketplace (i.e., online and mobile app stores), these differences are quite obvious. Viewing the evidence in the light most favorable to Defendant, although the marks have shared certain basic generic similarities in the past, there have also been key visual and contextual differences that form a legally sufficient evidentiary basis for a reasonable jury to find that the marks were more different than similar.

### 2. <u>Similarity of the Products</u>

The "inquiry in comparing the two products is not whether they are interchangeable, but whether 'the parties' products are the kind the public might very well attribute to a single source[.]'" *AutoZone*, 543 F.3d at 931 (quoting *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 463 (7th Cir. 2000)). Indeed, "[a] likelihood of confusion may exist even if the parties are not in direct competition . . . or their products and services are not identical[.]" *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001).

Plaintiff argues that the parties' products are similar because Plaintiff's allows users to safely prepare, store, file, and share tax documents and Defendant's assists users in filing taxes. In addition, Plaintiff focuses on the fact that both products are software available for download online and through mobile app stores. According to Plaintiff, no reasonable juror could reach a conclusion that the parties' products were not closely related. Defendant responds that the evidence regarding the basic functionality of the parties' products showed that they vary so greatly that it would have been perfectly reasonable for the jury to conclude that the products were not similar.

The evidence on this point consisted of witness testimony regarding how a person could use Plaintiff's product to securely save and share tax documents with an accountant and how Defendant's product also contained features aimed at protecting a user's confidential information. At the same time, testimony also showed that Plaintiff's product cannot be fairly characterized as "tax filing software." Despite the common feature of being able to securely share tax documents or tax-related information, evidence regarding the fundamental differences in the nature and purpose of the parties' products was sufficient for a reasonable jury to find that they are not the kind that the public might attribute to a single source.

### 3.    Area and Manner of Concurrent Use

The "concurrent-use factor assesses 'whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties.'" *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, No. 11 C 02242, 2013 WL 6839815, at *5 (N.D. Ill. Dec. 27, 2013) (quoting *CAE*, 267 F.3d at 681). The undisputed evidence on this factor showed that both parties' products are advertised and sold online and in mobile app stores. Thus, the evidence arguably would not have supported a finding that the parties did not advertise and sell their products in a similar manner.

### 4.    Degree of Care Likely to Be Exercised by Consumers

"The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE*, Inc., 267 F.3d at 683. If the degree of care is relatively low, "initial interest confusion" can occur "when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek*, 300 F.3d at 812.

Here, Plaintiff argues that consumers of both parties' products are relatively unsophisticated and therefore exercise a low degree of care and are especially susceptible to initial interest confusion. Defendant responds that there was sufficient evidence to conclude that consumers would have exercised a relatively high degree of care.

The evidence regarding degree of consumer care included information about the purchase process and price for the parties' products. It is undisputed that consumers usually purchase both parties' products after quickly searching online or in mobile app stores and that both products are available for download with a free-trial period. Even after the free-trial period ends, there was no evidence to suggest that either product was priced so high that it would fall into the category of goods for which a high degree of care is common (e.g., vehicles, luxury items, etc.) At the same time, both products require the users to share highly confidential and sensitive information like social security numbers and banking information. Based on this evidence, the Court concludes that a reasonable jury could have found that consumers would exercise a relatively low degree of care initially. However, given the nature of the trial period and sensitive information that would be shared during use, a reasonable jury could have also found that the amount of care exercised by a consumer would increase over time, after a consumer had already completed the initial download. Thus, the Court agrees that the evidence in this case regarding the degree of care likely to be exercised by consumers was sufficient to support initial interest confusion in theory. To that extent only, a reasonable jury could have leaned towards Plaintiff on the degree of care factor.

### 5. <u>Strength of Plaintiff's Mark</u>

"The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE*, 267 F.3d at 684. "The stronger the mark, the more likely it is that encroachment on it will produce confusion."

*AutoZone*, 543 F.3d at 933 (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11.73, at 11-169 to 170 (2008)). "The legal strength of a mark is usually the same as its economic and marketing strength." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (quoting 2 McCarthy, Trademarks and Unfair Competition § 11:73 (4th ed. 2003)). "The crucial question is whether the mark is strong enough that the public will form an association between the mark and the source of that particular good." *Id.*

The evidence presented by Plaintiff regarding the strength of its mark consisted primarily of testimony regarding the $67+ million spent on marketing, 18+ million downloads, and 2.9+ million users over the company's 14-year history. Of course, marketing spend, downloads, use, and longevity are relevant to strength, but none of those facts necessarily measure the strength of a mark for purposes of determining likelihood of confusion. While those numbers are nothing to scoff at, they do not automatically equate to a strong mark. Notably, Plaintiff did not point to evidence that tends to show that the general public had formed an association between the word "Keeper" and Plaintiff as the source of cybersecurity software products. As a result, the evidence on this issue is more or less neutral, and thus sufficient for a reasonable jury to have found for either party on this factor.

### 6.    Actual Confusion

Evidence of actual confusion is considered the best evidence of likelihood of confusion and is therefore entitled to substantial weight. *Int'l Kennel Club*, 846 F.2d at 1090. "One instance of actual confusion has been deemed sufficient to weigh in favor of finding a likelihood of confusion." *CAE*, 267 F.3d at 686. Although evidence of actual confusion typically relates to confusion in the sales context, evidence of actual confusion in the customer service context may also be relevant. *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1118 (7th Cir.

1997). Specifically, evidence of confusion in the service context may be considered in assessing actual confusion if such confusion had the potential to injure a plaintiff's goodwill and reputation. *Meridian*, 128 F.3d at 1118-1119. However, a customer inquiry about the difference between two companies is "markedly different" from evidence of confusion in the sales context and therefore insufficient, on its own, to prove actual confusion. *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 853 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2630, 219 L. Ed. 2d 1268 (2024) (citing McCarthy § 23:16 ("[W]hile enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion.")).

Plaintiff presented evidence of 294 instances where Defendant's customers contacted Plaintiff for service assistance. The evidence regarding these communications tended to show that customers had simply looked up and contacted the wrong company, not that they were confused about whether Plaintiff and Defendant or their products were related. The examples cited by Plaintiff generally include requests from Defendant's customers to deactivate their accounts and delete personal information. (Tr. 385-403). After Plaintiff's customer service agents advised Defendant's customers that they had contacted the wrong company, some customers noted that it was confusing, and thanked Plaintiff for its help and even apologized for contacting the wrong company. One person who originally appeared to be agitated and frustrated even ended the call by stating, "My apologies. I seem to have mistaken you guys with Keeper Tax. I'm sorry. Those guys stole money from me, not you guys. My apologies again." (Tr. 401-403).

The evidence of actual confusion by Defendant's customers who contacted Plaintiff's service department for help is distinguishable from *Meridian*. In *Meridian*, the defendant's client service manager testified that she had received calls and voicemails from the plaintiff's customers for service help with their insurance claims. *Meridian*, 128 F.3d at 1118. At least one of the callers

was angry and unhappy. *Id.* As a result, the Seventh Circuit reasoned that such evidence of actual confusion in connection with service (as opposed to sales) could show injury to goodwill and reputation and was therefore not "meaningless." *Id.* Here, although the customer service calls had the potential to prove relevant actual confusion, they did not because the examples provided by Plaintiff did not show any injury to its goodwill or reputation as required by *Meridian*. To the contrary, Plaintiff's customer service agents appear to have routinely advised Defendant's customers that they had contacted the wrong company and were then thanked for the correction and apologized to for the mistake. Even the person who accused Defendant of stealing money apologized repeatedly to Plaintiff and understood that Plaintiff had not done anything wrong. There is no evidence that the customer service inquiries resulted in any damage to Plaintiff's goodwill or reputation, so they are insufficient to support a finding of actual confusion under *Meridian*. Accordingly, a reasonable jury would have had a legally sufficient evidentiary basis to find for Defendant on the issue of actual confusion.

### 7. <u>Intent to Confuse</u>

Finally, although "proof of intent to deceive or to confuse is not necessary to prove trademark infringement[,]" *CAE*, 267 F.3d at 686, it is particularly important when present, *AutoZone*, 543 F.3d at 929. Evidence presented at trial showed that Defendant was aware of Plaintiff's use of the mark "Keeper" before it rebranded and started using the word. The evidence also showed, though, that Defendant was initially concerned that both party's use of "Keeper" would create confusion but later decided no such confusion would arise because their products and industries were so different. Based on the testimony, it was clear that Defendant's consideration of that potential confusion was not in order to deceive or confuse consumers but rather to avoid any confusion or infringement. In other words, this was a credibility determination within the

province of the jury that the Court may not invade. *See Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012). Accordingly, the evidence was legally sufficient for a reasonable jury to conclude that Defendant did not intend to deceive or confuse consumers through its use of the "Keeper" mark.

### C.      <u>Conclusion</u>

In sum, although the evidence presented at trial could not have supported a finding for Defendant on two of the factors relevant to the likelihood of confusion analysis (i.e., area and manner of concurrent use and degree of care), there was sufficient evidence to find for Defendant on the remaining factors (i.e., similarity of the marks, similarity of the products, strength of Plaintiff's marks, actual confusion, and Defendant's intent). Because no single factor is dispositive, *Promatek*, 300 F.3d at 812, the jury was entitled to give the factors whatever weight it deemed appropriate for this case. After reviewing the evidence and testimony, the Court finds ample evidentiary support for a finding in favor of Defendant on the issue of likelihood of confusion. Therefore, Plaintiff's motion for judgment as a matter of law is denied.

## II.      <u>Motion for New Trial</u>

Under Federal Rule of Civil Procedure 59(a), a court may grant a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). The Seventh Circuit has stated that "[a] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018) (quoting *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014)). To determine whether a jury's verdict is against the manifest weight of the evidence, courts consider the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011). A verdict will stand unless "no

rational jury" could have returned it. *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008).

A motion for a new trial based on an erroneous evidentiary ruling should only be granted if there is a "significant chance . . . that the ruling affected the outcome of trial. *Nelson v. City of Chicago*, 810 F.3d 1061, 1066 (7th Cir. 2016) (quoting *Maurer v. Speedway, LLC*, 774 F.3d 1132, 1135 (7th Cir. 2014)); *see also Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023) ("[W]e will reverse an evidentiary ruling only when we are left with a firm conviction that the district court's error could have affected the jury's decision[.]"); *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005) ("A new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, . . . and the result is inconsistent with substantial justice."). If a motion for a new trial is based on the "cumulative effect" of multiple errors at trial, a party "must show: '(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [their] trial fundamentally unfair.'" *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012) (quoting *United States v. Powell,* 652 F.3d 702, 706 (7th Cir. 2011)).

Plaintiff's arguments for a new trial fall into four broad categories. The first three relate to the admission of evidence regarding (1) the party's registered trademarks, (2) third-party use of the "Keeper" mark, and (3) Defendant's finances. The fourth is based on a question asked by a juror. The Court will address each in turn.

### A.    Evidence of Registered Trademarks

#### 1.    Defendant's Registration

Plaintiff contends that evidence of Defendant's trademark registration should not have been admitted because it was irrelevant and more prejudicial than probative. According to Plaintiff, the

Court's admission of Defendant's trademark registration and failure to give a curative jury instruction constitute errors that affected the outcome of the trial. The Court disagrees with both of these contentions.

First, there is no blanket rule that a defendant's trademark registration is irrelevant, as Plaintiff suggests. The timing, content, and existence of Defendant's registration were all relevant to issues before the jury. Specifically, the timing and existence go to whether Defendant intended to deceive or confuse consumers by using the word "Keeper" in connection with their product. In addition, the goods and services indicated on the registration were relevant to the question of whether Defendant used the word "Keeper" in connection with products that were similar to Plaintiff's.

Second, Plaintiff's argument that the jury inferred from Defendant's registration that the government already decided the issue of likelihood of confusion makes little sense in light of the jury instructions explaining that it was the jury's duty to determine whether a likelihood of confusion exists. Furthermore, Plaintiff elicited testimony that it had petitioned to cancel Defendant's trademark and that those proceedings were dependent on the outcome of this case. Thus, the risk of prejudice was minimal. As noted by Plaintiff, the Court previously expressed concern over the risk of prejudice to the jury, but that concern related to the registration being presented as proof that the USPTO had already made a decision regarding likelihood of confusion. Plaintiff has not pointed to any testimony or argument that placed Defendant's registration in that light, and the Court has not found any either.

The authority discussed by Plaintiff to support its position also misses the mark. In general, the cases involve evidence of the USPTO examiner's decision-making process or argument that such evidence proves noninfringement. *See, e.g, RGB Plastic, LLC v. First Pack, LLC,* 184 F.

Supp. 3d 649, 664 (N.D. Ill. 2016) (questioning probative value of examiner's decision in connection with cancellation counterclaim); *Hilson Research Inc. v. Soc'y for Human Res. Mgmt.*, 27 U.S.P.Q.2d 1423, 1435-36 (T.T.A.B. 1993) (finding irrelevant the fact that the examiner did not cite a previously registered mark); *Mktg. Displays, Inc. v. TrafFix Devices, Inc*., 200 F.3d 929, 934 (6th Cir. 1999) *rev'd on other grounds*, 532 U.S. 23 (2001) (rejecting argument that registration gave rise to inference of examination of prior mark and finding of noninfringement). Here, the admitted evidence and argument did not delve into the decision-making process or suggest that Defendant's registration was determinative of infringement. Thus, the Court is not convinced that the admission of Defendant's trademark registration into evidence or any testimony or argument related to it was irrelevant or unduly prejudicial.

Next, Plaintiff argues that, even if admission of Defendant's registration was appropriate, the Court should have given a curative instruction. Specifically, Plaintiff believes that the Court should have instructed the jury regarding the weight and context to be given to Defendant's trademark registration to avoid risk of the jury drawing improper inferences from the evidence. The authority relied on by Plaintiff does not support its argument. In *Sam's Wines & Liquors*, the court did not even discuss a curative instruction regarding evidence of the defendant's trademark. 1994 WL 529331, *5. Rather, it focused on what might be determinative of the weight to give to the USPTO's decision to grant a registered trademark, an issue not relevant in this case. *Id.* In *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, the court allowed evidence of the defendant's trademark registration and simply stated that it would *entertain proposed* limitations on the use of such evidence and comment on the effect of the registrations in front of the jury would be inappropriate. No. CIV 06-4112 ADM/JSM, 2009 WL 3526491, at *2 (D. Minn. Oct. 23, 2009). Here, Plaintiff has not pointed to any testimony and argument regarding Defendant's trademark registration that

18

touched on its effect. Indeed, at trial, the Court set guardrails on the use of that evidence to avoid any prejudice in that regard. Accordingly, a curative instruction was unnecessary and the lack thereof does not provide grounds for a new trial.

### 2. Cancellation Proceeding

During trial, Plaintiff introduced evidence of the petition for cancellation of Defendant's trademark and then questioned Defendant's CEO about the petition. Specifically, the witness stated that the petition alleged that Plaintiff's mark had priority and Defendant's mark was likely to be confused with Plaintiff's and that the petition was stayed pending the outcome of this action. (Tr. 746-747). Plaintiff now argues that a new trial is warranted due to the Court's decision not to give a curative instruction regarding the nature of a USPTO cancellation proceeding.

As an initial matter, Plaintiff's argument is confounding because Plaintiff is the one that introduced the evidence and elicited the testimony. Putting that aside, the Court agrees with Defendant that the proposed instruction would have served no purpose. Nothing about the cancellation petition or testimony regarding was prejudicial, as it simply informed the jury about the existence of the proceeding, the allegations involved, and the status. Therefore, no clarification regarding the cancellation proceedings was necessary or appropriate.

### 3. Incontestability of Plaintiff's Trademark

Plaintiff places great emphasis on the Court's decision not to allow Plaintiff to present evidence of the "incontestability" of its mark or to argue that such incontestability was material to the strength of its mark. But it is well-settled that incontestability relates *solely* to validity of a registered mark, an issue the parties stipulated to before trial. 5 McCarthy on Trademarks and Unfair Competition § 32:155 (5th ed.) (emphasis in original); *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 518 (N.D. Ill. 2011) ("[i]ncontestability does not broaden a

trademark in the sense that it allows a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim.") (quoting *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 377 (7th Cir. 1976)); *M-F-G Corp. v. EMRA Corp.*, 626 F. Supp. 699, 703 (N.D. Ill. 1985) (holding that incontestable status of a mark goes only to validity and not strength or weakness), *aff'd*, 817 F.2d 410 (7th Cir. 1987).

The out-of-circuit authority cited by Plaintiff on this point is nonbinding and generally irrelevant or unpersuasive. *See Great Concepts LLC v. Chutter, Inc.,* 90 F.4th 1333 (Fed. Cir. 2024) (considering cancellation of trademark due to fraud in obtaining incontestable status without any pertinent discussion of relevance to infringement analysis); *Sports Authority Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 961 (2nd Cir. 1996) (finding incontestability relevant to strength of mark analysis); *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993) (same); *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004) (holding that incontestable marks are presumed to be strong but that presumption may be rebutted by evidence of extensive third-party use of similar marks).

Furthermore, the sole in-district case cited by Plaintiff in its favor, *Nike, Inc. v. Just Did It Enters.*, relies on an out-of-circuit decision and is arguably dicta because it was immaterial to the court's conclusion that Nike's mark was strong. 799 F. Supp. 894, 897 (N.D. Ill. 1992) ("the incontestable status of Nike's federal registrations is also evidence of the strength of the marks."), *rev'd on other grounds*, 6 F.3d 1225 (7th Cir. 1993). For these reasons, the Court stands by its decision not to allow Plaintiff to offer evidence specifically addressing its mark's incontestability. Neither the exclusion of such evidence nor the lack of a special jury instruction on the issue affected the outcome of the trial.

### B.     <u>Third-Party Use</u>

Before trial, the Court reserved ruling on Plaintiff's motion in limine to exclude any evidence of third-party use of the word "Keeper". Subsequently, at trial, the Court admitted evidence of third-party use over Plaintiff's objections to foundation and relevance and declined to give the jury Plaintiff's proposed limiting instruction regarding third-party use. Specifically, Defendant presented evidence of other online stores and applications using the word "Keeper" in their names and in connection with their products. At each of these steps, the Court rejected Plaintiff's proposed limitations because third-party use may be relevant to evaluating the likelihood of confusion.

In its motion for a new trial, Plaintiff maintains its position that evidence of third-party use is irrelevant and a limiting instruction should have been provided. According to Plaintiff, the admission of such evidence and failure to give a limiting instruction was fundamentally unfair and constitutes reversible error. In response, Defendant argues not only that evidence of third-party use was relevant but also that a limiting instruction was unnecessary. Specifically, Defendant contends that evidence of third-party use and Plaintiff's non-enforcement against such third parties shows the scope of products over which Plaintiff understood it had trademark protection. As to the limiting instruction, Defendant asserts that one is appropriate only where evidence of a third-party's trademark registration is admitted. Finally, regardless of whether it was appropriate to admit evidence of third-party use or a limiting instruction should have been given, Defendant disputes that any of the third-party use evidence had any influence on the jury's decision.

As discussed above, to prove trademark infringement, a plaintiff must show likelihood of confusion, which involves consideration of the strength of the mark, among other things. In some cases, evidence of third-party use of a mark may be relevant to that analysis. *See, e.g., McGraw-*

*Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1171 (7th Cir. 1986) (discussing lack of evidence of similar marks that were actually used by third parties or promoted and recognized by consumers in connection with the strength of plaintiff's mark). If a party introduces evidence of third-party usage but fails to offer proof of promotion or recognition, it may be appropriate to give a limiting instruction to the jury. *See Ty Inc. v. Softbelly's Inc.*, No. 00 C 5230, 2006 WL 5111124, at *8 (N.D. Ill. Apr. 7, 2006) (citing *McGraw-Edison,* 787 F.2d at 1171).

The *McGraw-Edison* and *Softbelly's* cases do not support Plaintiff's position. In *McGraw-Edison*, the Seventh Circuit held that evidence of third-party trademark registrations similar to a plaintiff's mark are material in determining the strength of a plaintiff's mark only to the extent that such marks are actually used, meaning that they are promoted by owners or recognized by consumers. *McGraw-Edison*, 787 F.2d at 1171. *Softbelly's* applied this principle and held that an instruction would be necessary only if defendants attempted to submit third-party trademark registrations into evidence without offering evidence of their actual use through promotion or recognition. This case differs in that Defendant did not offer trademark registrations for the word "Keeper" held by third parties but rather cut straight to evidence of usage itself. The examples cited by Plaintiff include screenshots of webpages for a bookkeeping service, dating app, and cryptocurrency wallet. (DX 12, 38, 40). This evidence showed other companies actually using the word "Keeper" to promote their products and falls squarely within the category of third-party usage that *McGraw-Edison* and *Softbelly* contemplate as relevant to the strength of a plaintiff's mark and admissible without a limiting instruction.

Furthermore, at least with respect to one of the examples (keeper.app), the testimony surrounding the evidence related to Defendant's intent and knowledge of other company's using the word "Keeper" in their name when Defendant chose to go by the name "Keeper". (Tr. 762-

769). Finally, the relatively few exhibits showing third-party use of the "Keeper" mark played a trivial part in this trial. As discussed herein, there was ample other evidence from which the jury could have decided to return a verdict for Defendant. The Court is not convinced that there is significant chance that admission of evidence regarding third-party use or failure to give a limiting instruction affected the outcome of the trial.

### C.     <u>Defendant's Financial Status</u>

"Courts have held that appealing to the sympathy of jurors through references to the relative wealth of the defendants in contrast to the relative poverty of the plaintiffs is improper and may be cause for reversal." *Adams Lab'ys, Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985) (citing *Draper v. Airco, Inc.*, 580 F.2d 91 (3d Cir.1978); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276 (5th Cir. 1975)). Thus, "[i]f the wealth and size of a corporation are not at issue, counsel is bound to refrain from making reference to such size and wealth[.]" *Id.*

Before the trial in this case, the Court granted Defendant's motion in limine to exclude evidence of the amount of funds available from Defendant's capital fundraising to prove profit as a measure of damages. During trial, Plaintiff's expert witness testified that the amount of damages was $11.3 million. Subsequently, Defendant's CEO testified that "the amount of damages that [Plaintiff is] claiming would bankrupt us." (Tr. 789). Plaintiff now argues that this reference to the potential effect of the damages sought on Defendant created fundamental unfairness warranting a new trial. Defendant responds that the testimony was permissible because it did not violate the Court's ruling on the motion in limine, did not relate to any financial disparity between the parties, and, in any event, could not have had any prejudicial effect because the jury did not even reach the issue of damages. Plaintiff did not attempt to counter Defendant's arguments in its reply.

The testimony regarding the potential effect of the requested damages on Defendant does not warrant a new trial. First, the Court agrees with Defendant that the testimony was not within the scope of its ruling on the relevant motion in limine. The reason for excluding evidence regarding funds available from Defendant's capital fundraising was to avoid any confusion between such funds and any profit from infringing activity. The subject testimony in no way related to that issue. Second, the authority cited by Plaintiff prohibits evidence regarding the parties' *relative* wealth and financial *disparity*. The subject testimony was limited to how a large damages award might affect Defendant and did not draw any comparisons between Defendant and Plaintiff. Finally, Defendant is correct that the jury did not even reach the issue of damages, so there is not a significant chance that any unfair or prejudicial effect of the testimony affected the outcome of the trial. For these reasons, the testimony regarding the potential effect of the requested damages on Defendant does not warrant a new trial.

### D.       Juror Conduct

"There is a rebuttable presumption that the jury followed [the Court's] instructions." *United States v. Garcia*, 81 F.4th 691, 698 (7th Cir. 2023) (citing *United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019)). "A [party] can overcome the presumption by showing there is an 'overwhelming probability' that the jury did not or could not follow an instruction." *Id.* (citing *United States v. Gallardo*, 497 F.3d 727, 736 (7th Cir. 2007)).

At the beginning of the trial, the Court read preliminary instructions to the jury. The instructions stated that jurors must not make up their minds until after deliberations begin and to keep an open mind until then. The Court also instructed jurors that, if they needed to communicate with the judge, they should give a signed note to the courtroom deputy, who would give it to the judge. Throughout the trial, the Court reiterated the instruction about keeping an open mind before

breaks and recesses for the day. After Plaintiff's damages expert had resumed his testimony following a sidebar, a juror stated, "Excuse me. I have a dumb question. I don't want to ask . . . I can . . . I don't know if I can ask it." (Tr. 662). The Court urged him to write his question, which stated, "Question to judge: Is it necessary to understand damages, if infringement has not occurred?" The Court discussed the question with counsel and denied Plaintiff's motions to exclude the juror and for a mistrial. Because the question came at the time of damages testimony, the Court decided that the question did not indicate that the juror no longer had an open mind. Rather, it appeared that he did not understand that evidence regarding liability and damages would both be presented before the jury deliberated. Indeed, a few minutes before the question was asked, Plaintiff's expert testified that "the assumption you have to make for damages is that [Defendant] is liable for infringement." (Tr. 656:16-19). As such, the Court re-read the preliminary instructions regarding the conduct of the jury and order of the trial.

Plaintiff now renews its argument that the juror's conduct warrants a new trial because it shows that he had made up his mind on infringement before the closing of evidence or at the very least was confused and should have been questioned further or removed. In addition, Plaintiff asserts that the speed with which the jury returned its verdict for Defendant (less than one hour) shows that the jury had already made up its mind. In response, Defendant points to the timing and context of the question and argues that the Court's instructions were more than sufficient in addressing any misunderstanding.

The Court agrees that the context and timing are key. It is completely reasonable for a juror to wonder about the relationship between evidence of liability and damages while the first damages expert is testifying, and particularly after the witness made a statement about assuming liability for infringement. To dispel any possible misunderstanding about the order of trial and how the

jury should conduct itself in that regard, repeating instructions on those issues was the most common sense and least intrusive way to answer the question. Furthermore, the manner in which the question was asked and answered in no way signaled to the other jurors that he did not want to hear evidence regarding damages. The question was not read aloud to the other seven jurors, and reiteration of the relevant preliminary instructions was benign. For these reasons, the Court is not convinced that there is an "overwhelming probability"" that the questioning juror much less the other jurors did not keep an open mind until deliberations.

None of the cases discussed by Plaintiff convince the Court that the juror's question or the way it was answered are grounds for a new trial. The primary case on which plaintiff relies, *United States v. Vasquez-Ruiz,* 502 F.3d 700 (7th Cir. 2007), is simply not analogous. In *Vasquez-Ruiz,* a juror returned to the jury room one morning and found the word "GUILTY" written in her notebook, but the trial judge declined the question the jury about the note and instead gave a curative instruction reminding the jurors to reserve judgment for deliberations. 502 F.3d at 703. On appeal, the Seventh Circuit found the trial court should have questioned the jury to determine if there was any internal bias or outside influence due to the nature and unknown origin of the note. *Id.* at 707. Here, the source of the note is known (the juror who asked the question) and the note did not include a definitive statement regarding liability (it asked a hypothetical question regarding the relationship between liability and evidence of damages). There was no suggestion of outside influence and, based on the wording, context, and timing, the Court had no reason to believe that the juror (or any other juror) had made up their mind about any issue in the case. Accordingly, the re-reading of relevant instructions that addressed the question was the appropriate response and questioning the juror or jury was unnecessary.

Finally, Plaintiff's reliance on *United States v. Garcia*, 81 F.4th 691 (7th Cir. 2023), is misplaced. Plaintiff argues that the speed of deliberations is indicative of bias, but *Garcia* states that "[t]he speed of deliberations can be evidence that a defendant was prejudiced by a jury's failure to follow instructions." *Id.* at 700. Here, like in *Garcia*, there is no evidence of failure to follow instructions, so the speed of deliberations is irrelevant on that point. As such, neither the juror's question nor the Court's response warrants a new trial.

## CONCLUSION

For all the foregoing reasons, Plaintiff's Renewed Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b) and Motion for a New Trial Pursuant to Federal Rule of Civil Procedure 59(a) are denied.

**DATED**: November 24, 2025                    **ENTERED**:

LaShonda A. Hunt
_____
LaShonda A. Hunt
United States District Judge

27